A. W. Minyard v. Commissioner.
A. W. Minyard v. Commissioner
Docket No. 10133.
United States Tax Court
1947 Tax Ct. Memo LEXIS 70; 6 T.C.M. (CCH) 1137; T.C.M. (RIA) 47283; October 8, 1947
*70 George S. Atkinson, Esq., Tom B. Rhodes, Jr., Esq., and Luke B. Garvin, C.P.A., 1818 Irwin-Keasler Bldg., Dallas 1, Tex., for the petitioner. Allen T. Akin, Esq., and John W. Alexander, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves a deficiency of $58,906.22 in income tax for 1944, a 50 per cent penalty thereon of $29,453.11, and interest in the amount of $2,168.23, all of which was the subject of a jeopardy assessment made on October 26, 1945, prior to the mailing of the deficiency notice herein. In his computation of the deficiency the respondent determined that petitioner realized in 1944 taxable income "indicated by the following items: Increase in bank balances, 1944
$ 851.49
Net income reported from store oper-
ations, 1944
22,000.00
1944 real estate purchases
75,728.75
Total
$98,580.24" The petitioner alleges that the respondent erred in "increasing" taxable income by such amounts, imposing the fraud penalty, and determining the interest, and claims an overpayment of tax in the amount of $4,875.05. In his answer to the amended petition, respondent admitted that he *71 erred in "increasing" taxable income by $22,000 and alleged that the income of petitioner in 1944 from store operations was $11,676.21, that being the amount of net profit reported by the petitioner in his return for 1944 from the operation of his grocery, exclusive of $184.56, from discounts, and that with willful intent to evade the payment of income taxes, petitioner failed to report for taxation in his return for 1944 income received by him in that year in the amount of $76,580.24, that amount being the aggregate of the items of $851.49 and $75,728.75, supra. The stipulation of facts filed by the parties is incorporated herein by reference as part of our findings of fact. Parts thereof necessary for consideration of the issues will be set forth in findings made from other evidence. Findings of Fact The income tax return of petitioner, a resident of Dallas, Texas, for the taxable year, was filed with the collector of the second district of Texas. The return reported adjusted gross income of $14,306.42 and net income of $13,806.42. The adjusted gross income was reported as consisting of: Net profit from rents
$ 2,445.65
Net profit from business
(Retail Grocery & Market)
11,676.21
Discounts carned
184.56
*72 The return also reported tax liability of $4,360.95, payments of $9,236 on 1944 income tax, and an overpayment on tax of $4,875.05. The petitioner's schooling consisted of attending grammar school through the low sixth grade. He was born in 1901; never married; had nine brothers and sisters, and lived with his parents and some of his brothers and sisters in the family home until the death of his father in 1935 and mother in 1939. After the year 1927 petitioner was considered to be the head of his household. During 1944 and prior thereto he lived with his sister, Fay Minyard and his brother, M. T. (Buddy) Minyard. All of the petitioner's brothers and sisters have worked and while living at the family home they contributed to the household expenses. Petitioner has worked for a living since about the year 1915. He was first employed as a messenger by the Postal Telegraph Co. and as such earned from $18 to $27.50 a week. He worked as a special delivery messenger for the United States Post Office in Dallas, Texas, from 1918 until some time in 1936. The compensation paid to petitioner in 1918 and thereafter to 1933, inclusive, for his services at the Post Office was $31,015.52, and *73 ranged from a low of $617.36 in 1918 to a high of $2,681.12 in 1922. In 1934, 1935, and 1936, he was paid $1,599.02, $2,174.26, and $386.14, respectively. Petitioner owned an automobile in 1934 and 1935, and used it in connection with his work at the post office. In 1924 and until about 1926 petitioner delivered packages for Marvin's Drug Store in the morning or evening when he was off duty at the post office, for which he was paid $35 a week. Petitioner used a motorcycle to perform his duties at the post office and drug store at an average expense to him of about $300 to $400 a year. During the years 1922 to 1930 the petitioner owned and rented motorcycles. In 1922 he owned three motorcycles, acquired at a cost of about $1,200. The rental income received was about $50 a month. In 1923, 1925, and 1926, petitioner received a total of about $750 as prizes in motorcycle racing. During about six years, commencing in about 1923, petitioner earned an average of about $35 a month on charges made on loans of money to co-workers at the Dallas post office. Petitioner discontinued making the loans in about 1930, when it became difficult to obtain payments of loans. The petitioner leased *74 and operated a parking lot in Dallas from 1931 until some undisclosed time in 1936, from which he derived net income of from $100 to $150 a month. Petitioner paid $1,500 for the equipment on the lot. The lot was operated by brothers of petitioner. In 1927 petitioner broke one of his arms in an accident and on account of which he received $420 as workmen's compensation. Petitioner's brother Allen commenced a criminal career by bootlegging whiskey out of New Orleans. Allen was serving a term in the penitentiary in Atlanta in about 1926. Petitioner kept money for Allen and returned amounts to him upon request. After Allen married, his wife, Alice, joined him in making illegal sales of narcotics. On August 22, 1928, Allen executed a bill of sale, transferring to petitioner for a recited consideration of $10, certain furniture and equipment of a rooming house then being operated in Dallas by the transferor. Nothing was paid by petitioner for the property. Petitioner took charge of the rooming house for Allen and at the request of Allen, collected the rentals. On October 13, 1928, Allen was sentenced by the District Court of the United States for the Northern District of Texas to imprisonment *75 for a term of one year and one day from August 1, 1928, for violation of the Harrison Narcotic Act. Allen was arrested again in 1930 on a narcotic charge and upon conviction, he was sentenced on March 1, 1930, to serve a prison term of 18 months. Within a week after his conviction, Allen delivered to petitioner a Model A roadster, two Chevrolet coaches, the furniture he owned in his apartment, his personal belongings and four diamond rings to keep for him until he returned from prison. Allen died in prison in April 1931, leaving no widow or children. His nearest of kin were his parents and brothers and sisters. Petitioner sent Allen about $75 while he was in prison the last time. After Allen was taken to prison, petitioner sold the furniture in the apartment for $200. After Allen's death, petitioner sold the furniture in the rooming house for $750, the three automobiles for about $1,900 and two of the diamond rings for $3,500. Petitioner still has the other two rings. The proceeds of the sales were deposited in a safe deposit box in the National Bank of Commerce, Dallas, which petitioner acquired in 1931. In 1937 petitioner received $155 on a damage claim for injuries sustained *76 by M. T. Minyard. In 1939 petitioner received $969.45 as the proceeds of insurance on the life of his mother. At the time M. T. Minyard went into the United States Army in 1943, he left $3,000 cash with petitioner and on June 23, 1944, he loaned petitioner the sum of $1,400. In 1933 petitioner purchased a grocery business, including the inventory and fixtures, for $1,800. He still operates the business. Prior to 1944, he purchased equipment, furniture and fixtures, for his store at a cost of $23,932.15, which had an adjusted cost basis on December 31, 1943, of $12,812.89. Groceries obtained by petitioner and his employees from the store were charged to and paid for by them at retail prices. Petitioner paid the charges against him every year or two. On October 2, 1944, petitioner paid his grocery bill of $1,859.38 for groceries obtained by him at his business for a period of more than one year. Until the receipt of the check, petitioner's bookkeeper did not know that he had an account in the National Bank of Commerce. In and prior to 1944, petitioner operated and ice house next door to his grocery. Commencing in 1918 petitioner kept his savings in a bureau drawer at home. In *77 1922 he purchased a trunk and kept his money in it until 1931, when he removed the money to a safe deposit box in the National Bank of Commerce, Dallas, Texas. From 1934 to the close of 1943 petitioner purchased real property at a total cost of $36,241.40, which had an adjusted cost basis on January 1, 1944, of $32,597.86. The property includes a parcel purchased in 1942 for $12,619.30, of which $12,000 was currency removed from petitioner's safe deposit box. In May or June 1938, petitioner made an offer to purchase a parcel of real property in Dallas for $26,000 cash. On February 7, March 14, and September 28, 1944, petitioner purchased three parcels of real estate in Dallas for a total consideration of $136,650, of which he paid a total of $74,195.11 at the times of closing the respective transactions. Of the amount of $70,023 paid on the last purchase, $25,000 represented money borrowed on the closing date from the Grand Avenue State Bank of Dallas. During 1944, petitioner made the following deposits in his checking account with the National Bank of Commerce in the name of A. W. Minyard, which he opened on February 19, 1931, with a deposit of $1,000: February 7
$ 3,000
May 25
7,500
June 20
4,000
June 22
23,500
June 23
7,500
July 11
8,500
July 27
4,000
August 15
2,000
August 31
1,000
September 12
1,500
*78 Of the total deposits of $62,500, $51,940 was in currency. Of the remaining amount of $10,560, $7,500, deposited on June 23, consisted of a cashier's check obtained by petitioner for a check for $6,000 drawn on his grocery book account, $1,400 borrowed from his brother, M. T. Minyard, and $100 cash, and $3,060 of the deposit made on July 27, consisted of a check obtained for $3,000 face amount of war bonds and $60 interest thereon. Petitioner removed all of the currency from his trunk to make the deposits, and having previously removed $48,940 from his safe deposit box in the National Bank of Commerce. Of the amount removed from the safe deposit box, $23,500, deposited June 22, was obtained on March 28, 1944. Petitioner entered his safety deposit box four times in 1944, on March 28, June 29 and 30, and July 27. The deposit of $23,500 was brought to the teller's window by petitioner in a package, which was not an envelope. The teller who received the money never saw petitioner's Exhibit No. 7.some of the money was loose money and some was strapped with the ordinary paper strap. The money was "fit money," that is, it was not new and had not been used very much, and none of it was "old *79 large size" bills, which were not issued after July 10, 1929. Of the amount of $62,500 deposited by petitioner in 1944, $27,967.18 represented the excess of receipts over disbursements of petitioner prior to September 30, 1944. The interest of $60 received by petitioner in 1944 on war bonds was not reported in his return for that year on account of being overlooked. The records of the collector of taxes at Austin and Dallas, Texas, disclose that for the years 1917 to 1933, inclusive, petitioner paid the following taxes for the years shown: 1919
$17.89
1921
13.36
1922
16.60
1923
12.82
1925
5.58 The records of the collectors do not disclose that returns were filed or tax payments were made for the remaining years. For the years 1934 to 1944, inclusive, petitioner reported taxable net income of $73,127.06 and paid taxes thereon of $19,877.53, including $2,309 paid on January 10,1945. He reported an opening inventory of $12,062.62 in his return for 1944. Income tax returns filed by the petitioner did not include any amount for income derived from making loans at the post office or services performed at Marvin's Drug Store, and, except for one year, income *80 earned by racing motorcycles. The personal living expenses of petitioner since 1918 have been an average of $100about a month. Since the death of his mother in 1939 petitioner has employed a cook at a cost of $7 a week prior to 1944 and $10 a week in 1944. The income tax returns filed by the petitioner for the years 1934 to 1944, inclusive, and other evidence in the record, disclose that for such years the disbursements made by the petitioner, including $1,200 each year for living expenses, were $50,908.22 in excess of his receipts, with several adjustments. The taxable net income reported by petitioner for the years 1934 to 1943, inclusive, was $58,820.64, which income after adjustments for loss or gain on the sale of assets, depreciation, Federal income taxes paid, and living costs computed on the basis of $1,200 each year, left $53,876.99 for increasing petitioner's net worth during such period. In 1929 the petitioner borrowed $181 on an insurance policy and paid interest annually on the loan until 1941, when he paid the loan in full. The interest paid on the loan was $128.75. On March 30, 1935, petitioner opened an account in the National Bank of Commerce in the name *81 of Alex Minyard with a deposit of $600. Regular deposits were made in the account so that as of May 27, 1936, there was $7,500 in the account. On June 30, 1937, $300 was transferred to the account in the bank in the name of A. W. Minyard. The account showed one deposit in 1938 and 1939, and two withdrawals in the year 1939, and the account was closed on January 9, 1940, by a transfer of $6,000 to the account of A. W. Minyard. Petitioner opened a checking account with the Grand Avenue State Bank on January 6, 1938, with a deposit of $300. Since 1943 the account has been used by petitioner to deposit receipts (and make disbursements) of his grocery business. Deposits in the account and checks paid by the bank from it in 1944 were $167,941.23 and $174,756.04, respectively. The withdrawals included a check drawn on June 23, 1944, for $6,000 and deposited in petitioner's account with the National Bank of Commerce as used in connection in part payment of a cashier's check for $7,500. The bank balance in the account at the close of 1944 was $11,506.25. Petitioner's balance in the account decreased $6,814.87 during 1944. On October 2, 1944, petitioner opened an account with the Lakewood *82 State Bank of Dallas with a deposit of $2,145. During that year there was deposited in this account $5,418.62 and there was withdrawn $3,046.42. The balance in the account as of December 31, 1944, was $2,372.20. On July 7, 1931, petitioner opened a savings account in the National Bank of Commerce with a deposit of $1,000. No other deposits were made in the account, except for interest and the account was closed on February 14, 1933, by the withdrawal of $1,015, which was deposited in his checking account at the same bank. On January 1, 1943, the checking account of petitioner with the National Bank of Commerce had a balance of $1,414.99. Four deposits, aggregating $2,684.51, were deposited in the account and checks, totaling $655.91 were charged to the account in 1943, leaving a bank balance of $3,443.51 at the close of that year. Deposits were made in, and withdrawals were made from, the account at numerous times thereafter through 1944. Among the deposits made were $5,000 and $12,000 on June 5, 1940, and June 16, 1942, respectively, with money removed by petitioner from his safe deposit box, none of which had been received from Allen, and $1,000 and $1,832.40 on July 26, 1935, and *83 June 4, 1936, respectively, representing proceeds of life insurance and workmen's compensation received by petitioner on account of the death of his father. The balance in the account increased $851.49 during 1944. Until 1942, when petitioner engaged the services of an accountant for his business, petitioner left in his bank account only an amount sufficient to operate his grocery business. The excess funds, including his income from the United States Post Office and earnings of the parking lot, were placed in his safe deposit box. In 1942 or 1943, the accountant opened books to provide for the deposit of all grocery receipts, except for small cash purchases. In 1944 petitioner had no bank accounts other than the accounts with the National Bank of Commerce, Grand Avenue State Bank, and Lakewood State Bank of Dallas. A compact stack of 1,100 one-dollar silver certificates is a small fraction over five inches high. Six hundred such bills tightly bound together could be placed in petitioner's Exhibit No. 7, an envelope, but would push it out of shape. The returns filed by petitioner for the years 1942, 1943, and 1944 were prepared by his accountant, who was requested by petitioner *84 to include therein all items of income and claim deductible expenses. The accountant included in the return all income of which he had knowledge. The accountant was aware that petitioner had a personal checking account at the National Bank of Commerce, but was not advised of, and did not inquire into, the balances in the account. The return for 1944 was prepared from a cash journal kept for the grocery business, memoranda supplied by petitioner and rental books opened in October 1944. After the accountant prepared the return for 1944, he called petitioner's attention to the fact that gross profit from the grocery business was considerably less than it was in 1943. The wholesale cost of merchandise was higher in 1944 than in 1943. A recheck of the inventory disclosed some merchandise had become worthless from water damage. Gross sales in 1944 were about $5,000 in excess of 1943; the opening and closing inventories in 1944 were about the same and there was an increase of about $8,000 in purchases in 1944. The cash book kept by petitioner for purchases and sales of produce show that for 1944, purchases and sales were in the respective amounts of $28,770.18 and $28,499.02. The figure *85 for sales is inaccurate because of errors made by operators of cash registers in the store in registering sales ofproduce as sales of groceries. The mark-up on produce was 20 to 30 per cent of cost and was made by M. T. Minyard, manager of the store. Employees of the store fixed the retail prices for groceries. The ratios of petitioner's gross profit to sales in his grocery business for 1943, 1944, and 1945 were reported in his returns for such years as 18.9 per cent, 15.3 per cent and 19.9 per cent. The ratios for prior years, as disclosed by income tax returns, ranged from a low of 13.7 in 1937 to a high of 21.3 per cent in 1938. Opinion In his determination of the deficiency the respondent found that in 1944, the taxable year, petitioner realized taxable income in the amount of $98,580.24, "indicated" by increase in bank balances in the amount of $851.49, net income reported from store operations in the amount of $22,000, and real estate purchases in the amount of $75,728.75. No other explanation was given for such action. In his answer to the amended petition respondent admitted error in "increasing" taxable income by $22,000, and alleged that the income from store operations *86 was in the amount of $11,676.21, this figure being the amount of net profit reported by petitioner in his return from the operation of his grocery business. He then alleged that petitioner, with willful intent to evade the payment of income taxes, failed to report for taxation, the amount of $76,580.24. The respondent alleged that of this amount, $851.49 was derived from an increase in the balance of the bank account of petitioner with the National Bank of Commerce, resulting in part from deposits of currency in the amount of $51,940, and that part of the remainder of $75,728.75 was withdrawn from the bank account and that the balance was derived from unknown sources. Upon brief, respondent contends that petitioner received in 1944, and with fraudulent intent to evade income taxes failed to report as income, the amount of $52,100, this being the total of $60, representing interest received on war bonds and not reported for taxation, and unexplained cash deposits of $52,040 in the National Bank of Commerce. We have found as a fact from the evidence that the failure of petitioner to report the interest of $60 was due to an oversight. Accordingly, the amount will be included in income *87 under a recomputation under Rule 50. The present position of the respondent as to the amount of income from an undisclosed source results, in part, from a stipulation that of the amount of $74,195.11 cash used by petitioner in 1944 for the purchase of real estate for a total consideration of $136,650, $25,000 represented borrowed money, leaving $49,195.11 of cash used out of the deposits of $52,040 of cash. The parties now agree that the crux of the issue is the source of the deposits of $52,040. The petitioner contends, in general, that he acquired part of the money from his brother Allen and that the remainder constituted savings. The respondent argues that we should not accept at its face value testimony and other evidence that petitioner received money from his brother Allen and that there is no proof that petitioner could have saved the remaining amount. The Commissioner is compelled at times to use bank deposits as a starting point for making determinations of income. Such determinations are presumed to be correct and the burden of showing error is upon the taxpayer, regardless of the difficulties involved. ; affd. *88 ; ; affd. ; ; affd. . First, petitioner contends that he had available in 1944 a total of about $51,000 from his own savings including $24,550 of money received from his brother Allen and from the sale of Allen's effects and personal property. Petitioner testified categorically that he saved about $20,000 to 1931, about $5,000 from 1931 to 1934, and about $40,000 from 1934 to 1944, a total of $65,000. The figures are no more than estimates expressed by petitioner and are not fully supported by evidence to add weight to his testimony. Petitioner offered no explanation of what he meant by the use of the term "savings." If he meant that he had an accumulation of that much money by 1944, in addition to the $24,550 of currency allegedly received from Allen, he should have had $89,550 on hand in 1944. Petitioner makes no such contention. That he did not is shown by the fact that he borrowed $26,400 to make the down payments on the real estate he purchased prior to September 30, in 1944. Prior to 1944 he had *89 made capital investments of about $62,000 in the grocery store, and real estate, and in addition had war bonds of the face amount of at least $3,000, bank balances of about $22,000, and an opening inventory of about $12,000 at his grocery. It is apparent that he did not intend to include such amounts; otherwise he would have testified to savings of a much greater amount, especially in view of the fact that he allegedly also had substantial amounts of currency in his safe deposit box. His indefiniteness on the amount is illustrated by testimony on cross-examination that he saved $20,000 by the time he purchased the grocery business in 1933, contrary to other testimony that he had saved that amount prior to 1931, and $5,000 more thereafter to 1934. Petitioner's disregard for actualities is further shown by testimony before a special agent that he cashed $8,000 or $9,000 of war bonds in 1944, contrary to an admission here that the amount was only $3,000. He also increased the amount of the money reeceived from M. T. Minyard in 1943 from $200 to $3,000 when appearing before us. The testimony has no reasonable basis and we decline to accept it at its face value. Petitioner's lack of faith *90 in its probative value is shown by the voluminous testimony he offered at the hearing as to his receipts and disbursements. To support the reasonableness of his contention that the deposits were made from savings and accumulations of at least $51,000, petitioner refers to evidence of excess in the amount of $52,485.93 of his income and receipts over disbursements to 1944, as follows: Income: Post Office
$31,015.52
Drug Store 1924-1926
4,410.00
Rental motorcycles
5,400.00
Prizes racing motorcycles
750.00
Loaning money at Post Office 1918-1930
5,460.00
Parking lot 1931-1933
4,500.00
Workmen's compensation 1927
420.00
$51,955.52
Received from Allen and sale of his property
24,550.00
Net income per returns 1934 to September 30, 1944, less income taxes paid
51,981.93
Nontaxable income 1934-1944
Insurance: Father
$1,000.00
Children
400.00
Mother
969.45
$2,369.45
Workmen's compensation on father
1,832.40
Accident M. T. Minyard
155.00
Borrowed from M. T. Minyard
4,400.00
8,756.85
Total
$137,244.30
Disbursements: Living expenses 1918 to September 30, 1940
$27,285.00
Real estate on hand January 1, 1944
32,597.86
Equipment, furniture and fixtures on hand January 1, 1944
12,812.89
Inventory on hand January 1, 1944
12,062.62
Total
$84,758.39
Excess of receipts over disbursements
52,485.93
*91 Some of the figures used by petitioner are not in accordance with the evidence. The petitioner's figure for income from Marvin's Drug Store is based upon employment for three full years and expense of $350 each year for his motorcycle. He testified that he worked there in 1924 to about 1926 and that his motorcycle expenses averaged $300 or $400 a year. Accordingly we have reduced the net income to $2,840. The petitioner computed his earnings on loans at the post office on the basis of $420 a year for 13 years. Like much of his other testimony, the petitioner's testimony on his earnings from these loans is conflicting. He first testified on direct examination that in addition to his regular pay at the post office he had income from loans, then that the loans were made during a period of about six years and finally, during the course of the same examination, that they were made during the period from "'30 on back", not in 1934. On redirect examination he testified that he started to make the loans about 1923. This testimony of petitioner does not warrant a finding that the loans were made for more than six years. The petitioner does not explain upon brief how he arrived at income *92 of $4,500 from the parking lot for the period 1931-1933. He testified that he operated the business from 1931 until 1936 at a profit of from $100 to $150 a month and that he paid $1,500 for the equipment on the lot. The figure seems to have been computed on profits at the rate of $125 a month for four years, less $1,500 for the equipment. The result agrees with an allowance, based upon the evidence, of $100 a month, for five years, less the cost of the equipment, and therefore we accept it. Considerable testimony was offered with respect to the alleged receipt of $24,550, consisting of $18,000 in currency from petitioner's brother Allen and the remainder from the sale of Allen's personal property and effects. Specifically, he says that the amount was derived as follows: Year
Source
Amount
1928
Currency from Allen
$10,000
1930
Currency from Allen
5,000
1930
Currency from Allen
3,000
1931
Sale of personal effects
200
1931
Sale of furniture
200
1931
Sale of furniture
750
1931-1932
Sale of three automobiles
1,900
1933
Sale of two diamond rings
3,500
It is contended that Allen delivered $10,000 in currency to petitioner in about July 1928, *93 after the death of the former's wife and before his conviction on a narcotic charge, and $5,000 and $3,000 in 1930, before and after, respectively, his conviction on a similar charge. The other property was turned over to petitioner at the time of the alleged last delivery of currency. The money, according to the testimony, was kept by the petitioner in his trunk at home until after the death of Allen in prison in 1931, when he placed it in a safe deposit box. According to the testimony before us the petitioner, in the presence of Allen and their brother, M. T. Minyard, counted $18,000 of Allen's currency in his possession at the time the last amount was delivered. The testimony also is that as personal effects and property of Allen were sold by petitioner, the proceeds were placed in the safe deposit box with the other currency. The record is replete with testimony concerning petitioner's economical living habits, his desire to save money and the methods he employed to store money at his home in preference to depositing it in a bank for safekeeping. It discloses that petitioner is among that class of individuals who would likely know at all times the source and time of receipt of *94 large sums of money in his possession. The petitioner was examined under oath by a special agent of the Bureau of Internal Revenue on November 7, and December 20, in 1945, and April 2, and 10, in 1946. His brother, M. T. Minyard, was examined under oath by a special agent on April 9, 1946. Upon being asked where petitioner got the money, M. T. Minyard testified that Allen left $18,000 or $20,000 after Allen's wife died; that he was present when Allen delivered the money to petitioner and that no other member of the family knew about the receipt of the money. The petitioner did not divulge to the special agent the source of the money allegedly received from Allen until during the course of his examination under oath on April 10, 1946. He testified before us that he did not inform the special agent prior thereto because he had not been asked to and did not wish to revive Allen's affairs. He also testified before the special agent on April 10, 1946, that Allen counted out $10,000 at one time but could not remember the amount he delivered on the last two occasions; that he received some personal property, without, however, including four diamond rings; that "He brought it out there *95 and give it to me and just kept on going"; that he "imagined" he had invested Allen's money prior to 1942 but that some of it could have been used for that purpose in that year; that the money he invested in 1944 was his own but "I expect it was some of his too because it all came out of my box"; that he took Allen's money out of the box "any time I needed five or three thousand * * *;" that M. T. Minyard knew about the money but did not know exactly how much he had; that M. T. Minyard came through the dining room when he was counting the money and that he told him on one occasion that he had returned the money to Allen. He testified before us that on April 10, 1946, he thought that M. T. Minyard was the only other one who knew he had received money from Allen but learned later that others knew about it. The testimony here of M. T. Minyard and Ted Hinton, a roomer at petitioner's home from the latter part of 1929 until the spring of 1930, is that they saw Allen make the second delivery of money to petitioner, but left the room immediately and did not know the amount. The examination of petitioner by the special agents occurred after a jeopardy assessment of the deficiency involved *96 herein, in view of which petitioner should have known of the need for the protection of his interest to divulge the source of the money. The fact that he offered no complete explanation until confronted with testimony of his brother, throws considerable doubt on the veracity of his testimony before us. It at least requires us to examine it carefully before accepting it at its face value. Petitioner does not contend that he received more than $24,550 from Allen. He made a bank deposit of $23,500 in currency on June 22, 1944, all of which, according to petitioner's testimony, represented money received from Allen and proceeds of sales of his property. Other testimony of petitioner is that the $23,500 of currency was kept in an envelope, introduced into the record as petitioner's exhibit No. 7, in his lock box until March 1944 and then taken to his home. The currency, according to petitioner's testimony, was at all times kept in the safe deposit box separate from other money on deposit there. The amount deposited was only $1,050 less than the total amount alleged to have been received. He testified here that he used none of Allen's money in or prior to 1942; that he never went below *97 $23,500, his testimony before the special agent that he would take $3,000 or $5,000 of it as needed, being wrong, because the $23,500 stayed in the envelope. The testimony of M. T. Minyard is also contradictory. He testified under oath before a special agent in response to a question as to where petitioner got the money, that Allen gave him $18,000 or $20,000 after Allen's wife died in 1928. The testimony before the special agent conveys the impression that Allen gave all of the money to petitioner at one time. His testimony before us is that he was present the first time Allen delivered money to petitioner in 1930, but left the room and did not learn the amount; that when the second delivery was made in 1930, Allen requested petitioner to remove all of his money from the trunk and that $18,000 was counted in his presence. His testimony is confusing and conflicting in other respects. He testified before a special agent on April 7, 1946, that he did not know whether Ted Hinton, a roomer at the house, knew about the delivery of money to petitioner by Allen; before us he testified that Hinton was present in the room when the first delivery was made in 1930. He also testified before *98 us first that the first money delivered in 1930 was tied in a bundle and then that Allen removed the money from his shirt. He testified before the special agent on September 10, 1946, that the last delivery of money in 1930 was made from a satchel, which he described in detail. Here, he testified that so far as he knew, Allen never carried a satchel and then that he did carry a small one and had seen money in it. Before us he testified that he did not know whether Allen brought any money the last time in 1930, when, according to his testimony, he saw $18,000 counted, and that Allen did bring some money with him on that occasion. To add to the confusion and contradictions, petitioner testified before us that the $3,000, or last delivery, which, according to M. T. Minyard was in a satchel, was brought to the house in Allen's pocketbook. Considering the unusual nature of the alleged transactions, we are unable to understand why there ever could be any honest doubt in the mind of the witness concerning the affair. The fact that his testimony now generally agrees with that of petitioner indicates collusion on the subject. The testimony of Fay Minyard, petitioner's sister, adds nothing *99 on this point of the case. She testified that she knew Allen had left some money with petitioner but did not know the amount. When asked for the source of her information she replied, "Well, at our house we usually know things when we don't see them". When asked "Did any one ever tell you Allen Minyard left money with A.W.?" she replied "No, he didn't tell me". Notwithstanding this testimony, when pressed for the source of her information, she testified "Well, Allen told me himself. Allen told me himself." The testimony of another sister of petitioner has no greater amount of weight. She first testified that she saw money stacked in petitioner's trunk and then that the currency was not stacked, but was in an envelope. Petitioner first testified before us that the money he received from Allen was in the present size five and ten dollar bills and then that some of it consisted of twenty dollar bills and that he exchanged the bills of smaller denomination for twenty dollar bills before depositing the money in his safe deposit box in 1931. He testified later that after placing the money in the safe deposit box, he exchanged some of the currency for larger denominations, and that he *100 received large size currency from Allen and not the present size. The smaller size was not issued until July 1929. None of the old large size bills were issued after that date. His testimony is conflicting with respect to the larger denominations of currency he substituted for the smaller bills and the number of bills of each denomination. He first testified that the currency included a one-thousand dollar bill and he thought a five hundred dollar bill and some fifties, in addition to the twenties. Under further questioning he testified that he had some hundred dollar bills in the envelope. Later he testified that the $23,500 consisted of one one thousand dollar bill, some fifty and hundred dollar bills and the remainder in twenties, but could not recall the number of fifty and hundred dollar bills. On redirect examination, he testified that the currency included one one-thousand dollar bill, and two or three hundred and fifty dollar bills and was not sure that it also included a five-hundred dollar bill. The bank teller who received the deposit testified that the deposit was not in the same denomination of currency. All of the $23,500 of currency, according to petitioner's testimony, *101 was kept in Exhibit No. 7 after 1932, 1933, 1934 or 1935. Exhibit No. 7 is an envelope 4 1/4inch X 10inch crushed on the sides for a normal expansion of the thickness to one inch. According to petitioner's testimony he never had more than eight bills of a higher denomination than a twenty dollar bill, or a total of $1,950 in the higher denominations, leaving $21,550 in about 1,075 twenty-dollar bills. There was positive proof at the hearing that such a number of bills would make a stack about five inches high and that only about six hundred bills could be placed in Exhibit No. 7. Thus there is proof that most of the money alleged to have been received from Allen was never kept by petitioner in Exhibit No. 7, contrary to his testimony. Other evidence casts doubt upon whether any of the money was derived from Allen. Petitioner was regarded as the head of the family after 1927, notwithstanding the fact that his father lived until 1935 and his mother until 1939. There is testimony that petitioner kept money for some of his younger brothers, and in some respects looked after their welfare, indicating that he served as a banker for them. Notwithstanding such conditions, petitioner, according *102 to the evidence, diligently refrained from discussing the matter with the members of his family, even after Allen's death eliminated all possibility that he would return to claim it. The evidence shows no attempt on his part to have the money administered as part of Allen's estate or otherwise share it with his brothers and sisters. Petitioner testified that Allen never asked him for a return of any of the money. Allen was out of prison for an undisclosed length of time after serving the sentence imposed upon him in 1928. If, as petitioner contends, he was a mere custodian of the money, it seems to us that Allen would have asked him to return at least some part of it, especially immediately after his release from prison. We have reviewed with care all of the evidence relating to the alleged receipt by petitioner of $18,000 in currency from Allen, much of which is set forth in detail, supra. The contradictory testimony leaves us with no alternative other than to decline to follow it. Accordingly, we find that no part of the $23,500 deposited on June 22, 1944, was received from Allen, as alleged by petitioner. No other contention is made by petitioner as to the source of the money. *103 The remaining amount of $5,500 of the deposit of $23,500 represents proceeds of sale of personal property transferred to and otherwise put in the possession of petitioner by Allen before he went to prison the last time. The evidence on the source of this portion of the deposit is not subject to all of the same objections as the evidence offered on the $18,000 of currency alleged to have been received from Allen. The testimony of petitioner concerning the receipt of the property is supported by bills of sale for the furniture and testimony of other witnesses. Petitioner testified to the amounts that he received for the property and his testimony in that regard is uncontradicted, even though the amount for the automobiles seems to be excessive. Accordingly, we find that $5,500 of the deposit of $23,500 was received by petitioner from the sale of property delivered to him by Allen and does not constitute taxable income of petitioner in 1944. Petitioner testified that he and his mother cashed some insurance "on the boys" after the death of his father in 1935 and received $400. This is not proof that petitioner received the money. Finally petitioner computes his personal living expenses *104 since 1918 at the rate $85of a month. His testimony represents nothing more than an estimate. He first testified that such expenses since 1918 were not over a hundred dollars a month and many times less than that amount. He then limited the testimony to the period from 1918 to 1934 and later testified that the expenses prior to 1934 were from $75 to $85 a month. He offered no testimony on his living expenses on a monthly basis after 1934, but testified in regard to the board he paid and received and the payments by him of household expenses. The testimony on the point is conflicting and indefinite. Petitioner testified that his mother collected board from her children living at home until her death in 1935, and paid the household expenses, other than rent and utilities, which he paid. Petitioner's mother died in 1939, not in 1935. He then testified that when the family moved to 716 Mt. Auburn Street in 1934, he started to pay the grocery bills and received board from a brother and sister. He also testified that his mother paid the household expenses after the death of his father in 1935, except the grocery bills and utilities, and that his brothers and sisters made contributions to *105 the grocery bills. Petitioner's sister testified that after 1934 board was paid to her mother, who took care of all bills until her death. The personal bank account of petitioner with the National Bank of Commerce discloses withdrawals, which, without explanation, indicate personal expenses greatly in excess of $1,200 a year. Considering the state of the record on this point, we think monthly expenditures of $100 are more accurate than the finding of $85 a month proposed upon brief by petitioner. The petitioner had three motorcycles in 1922 which he had acquired at costs ranging from $385 to $435. These disbursements of about $1,200 are not included in petitioner's computation. Neither did petitioner include the $75 sent to Allen, or $128.75 interest paid on the insurance loan, or any operating expense for the motorcycle he used during his employment at the post office. The motorcycle expense was $400 a year during the two years he used it at the post office and Marvin's Drug Store. Under the circumstances, we have deducted from petitioner's post office income $2,800 for motorcycle expense, this being at the rate of $200 a year for 14 years. The computation of petitioner includes *106 nothing for the cost of operating the motorcycles he rented and used for racing purposes, or the cost of the automobiles he owned in 1934 and 1935, contrary to his testimony that he did not acquire an automobile until about 1945. He derived $6,150 of income from renting and racing motorcycles. We regard $2,000 as a fair estimate of the operating expense incurred in earning the income and $650 as reasonable cost of the automobile. See . It does not appear that petitioner kept books of any kind prior to the purchase of the grocery business in 1933. He employed an accountant in September 1942 and instructed him to establish an adequate set of records for income tax purposes. The absence of proper records accounts for much of the estimates in the record here of receipts and disbursements. Respondent contends that some of the estimates were exaggerated by the petitioner. As already indicated some of them were excessive and have been adjusted in accordance with the evidence. No doubt some of it was attributable to faulty memory. For instance, he testified, on direct examination, that he received about $700 in 1937 on account of injuries *107 sustained by his brother in an automobile accident. On cross-examination notwithstanding reference to checks totaling $155 in payment of the liability, he insisted that the money was $700. He now admits upon brief that the correct amount is $155. He testified that on one occasion he advised an employee of the Federal government assigned to the Dallas Post Office to assist taxpayers prepare their income tax returns, that he estimated his earnings from loans to employees at the post office to be from $200 to $300 a year. Other testimony here, which we have followed, is that it averaged about $35 a month. He testified before a special agent that he received $200 from his brother, M. T. Minyard, in 1943. Here, he testified that the amount was $3,000. Petitioner's burden of proof in the absence of adequate records was a difficult one and has been taken into account in weighing the evidence. If made impossible by inadequate records, petitioner must bear the burden. . We regard the evidence on receipts and disbursements, relied upon by petitioner to support his contention on the amount of his savings, as the best proof of the amount deposited *108 in 1944 out of savings from prior income. Taking into account the adjustments made by us, supra, we find that of the amount of $62,040, deposited in 1944 and determined by the respondent to represent taxable income in that year, $27,967.18 constitutes income and receipts of prior years; as to the remaining amount of $24,072.82, we find that petitioner has failed to overcome the presumptive correctness of the respondent's finding that the amount was taxable income in 1944, and to that extent sustain the respondent. On the question of fraud, the respondent had the burden of proof. The failure of petitioner to fully overcome the presumptive correctness of the deficiency does not create a presumption or inference of fraud, the fraud issue being a separate matter, and doubts which operate against the petitioner under the burden he had as to the deficiency, operate against the respondent upon the issue of fraud. . The proof required of the respondent to sustain his burden, must be clear and convincing. . All evidence in the record may be considered under the fraud issue. *109 (440); . Generally evidence offered on other issues will establish actual receipt of the income upon which the Commissioner based his charge of fraud and thus relieve him of part of his burden of proof. The presumption of correctness in favor of respondent as to the deficiency is a rule of evidence, , "to supply the place of facts", , and does not extend to findings of fraud by the ; affirmed, ; ; ; ; , in which latter case the court said that "An indictment [of fraud] by the Commissioner is not evidence." In , the Court said: "Fraud is not presumed either as a matter of law or fact, unless under circumstances not fairly susceptible of any other interpretation." The respondent determined the deficiency by regarding *110 as income received by petitioner, an increase in bank balances, an amount for profit from the operation of a grocery store and cash used to make purchases of real estate. In the statement accompanying his notice of deficiency the respondent stated that such sources "indicated" the receipt of the income being taxed. The answer of respondent admitted error in increasing taxable income from petitioner's grocery store from $11,676.21, the amount reported, to $22,000. He alleged that the amount of $75,728.75 withdrawn from the bank to make purchases of real estate was derived from unknown sources. A like position was taken at the hearing, except that he reduced the amount to about $52,000, it having been stipulated that $25,000 of borrowed money was used to purchase the real estate. Upon brief he relies upon petitioner's failure to report $52,100, the cash deposited in the National Bank of Commerce and which he regards as taxable income to support his charge of fraud. No reliance is made on increase in bank balances during the taxable year. Such abandonment seems to have been due to proof here of a decrease in the bank balances of petitioner. Thus it is apparent that respondent's determination *111 of the receipt of income has been abandoned in some respects since then as the case developed. The respondent made no direct proof, excepting the $60 of interest on government bonds, of the receipt of unreported taxable income in 1944. With a minor exception, all of the deposits consisted of currency and substantially all of it was removed from a safe deposit box on four occasions in March, June and July of the taxable year. A mere showing that currency deposited in a bank came from a safe deposit box is not, of itself, proof that the money was subject to taxation in the year during which it was deposited. It is particularly true here where the facts show that petitioner had been using a safe deposit box for storing currency since 1931, and that prior thereto he kept his savings of money at his home. Upon brief respondent discusses probable sources of part or all of the alleged income. It is mere speculation and may not be used as a substitute for the clear proof required of him under the issue. The Board and this Court have sustained fraud penalties in cases in which bank deposits formed the basis for the deficiencies. Some of such cases are relied upon by the respondent in *112 this issue, but they are distinguishable. In , there was proof of the receipt of income for preparing income tax returns and admissions by the taxpayer to a special agent of receipt of some of the income. In , it was shown that the estate of the taxpayer did not, at the beginning of each taxable year, include the amounts deposited, and that he failed to report all of the fees received by him for legal services. Here we are in no position to say that all of the amount in question was not in the safe deposit box at the beginning of the taxable year. In , there was proof of the income each taxable year from gambling activities. Similar cases, cited by respondent, are to the same general effect. The facts in , disclosed illegal dealings in whiskey over a period of seven years and failure to furnish to counsel who prepared his returns, information concerning bank deposits and other facts. We are not unmindful here of petitioner's failure to prove the source of a large part of the income, particularly the $18,000 alleged *113 to have been received from Allen, or our finding, in part, for the respondent. That finding was based upon the presumption of correctness of the Commissioner's determination and failure of proof by petitioner to overcome it. His failure in that regard does not relieve respondent of his full burden of proving that the deposits of money constituted income in 1944, the failure to report which was due to fraud with intent to evade tax. Considering petitioner's habit of withholding from deposit to accounts in banks, amounts of currency commencing in 1918, mere proof of such deposits in 1944 does not meet the requirement of affirmative, clear and convincing proof of fraud by the respondent, or raise a presumption that the money was earned in 1944 - and we have refrained from so holding, our conclusion as above stated being based on failure of proof. Further discussion seems unnecessary. Considering all of the facts and inferences to be drawn therefrom, we are of the opinion that respondent has not shown by proof required of him, that part of the deficiency was due to fraud with intent to evade tax. Decision will be entered under Rule 50.